Duer, J.,
delivered the opinion of the court.
Without adopting the reasons of the vice-chancellor, we are constrained to affirm his decree upon grounds to which he has not adverted in his opinion, and which we shall proceed to state, with as much brevity as may be consistent with their distinct exposition. We entirely agree with the learned counsel for the appellants, that the bequests which are the subject in litigation, must be treated as pecuniary legacies, notwithstanding it might become the duty of the executors in the event of a deficiency of the personalty to sell the lands in order to satisfy them; nor was this position, as we understood the learned counsel for the respondents, meant to be denied by him; and as it is not probable that it will be hereafter disputed, it is needless to cite authorities in its support.
The bequest to the Auxiliary New York Bible and Common, Prayer Book Society, and which is now claimed, as its assignee, by the New York Bible and Common Prayer Book Society, we are satisfied was a contingent, not as the learned counsel for the appellants was forced to contend, a vested legacy. It could not' vest, even in interest, until the death of the last annuitant,' since the gift itself, from the terms in which it is- expressed, is made to depend upon the contingency of the corporate existence of the society at that time.
The distinction between'a bequest of a'sum of-money at a particular specified time, and a similar bequest; payable or to be paid at the same time, is somewhat refined, and it is probable seldom exists in the mind of a testator; but it is established by so long a series of decisions, that it must now be regarded as a constituent part of the law which it is our province and duty to administer. In the second case, the gift is immediate,'and only its payment postponed. • In the first; the gift itself is postponed; in the language of the books, the time in the second case is annexed to the payment, in the first to the substance of the gift. The first is a contingent, the second a vested legacy: A vested legacy, where the legatee dies before the times fixed for its payment, passes to his personal representatives, or if it has been *174 previously assigned by him, to his assignee. A contingent, upon the happening of the same event, is wholly extinguished and sinks into the residuum for the benefit of the residuary legatees or next of kin, and a previous assignment is necessarily defeated; since, every such assignment, if otherwise valid, is subject to the same contingency as the gift itself. (Stapleton and Cheales, Prec. in Chancery, 317; Jackson v. Jackson, 2 Brown Par. Cases, 254; Bolger v. Mackell, 5 Ves. 509; Smell v. Dee, 2 Salk, 485; Cruse v. Barley, 3 P. Wm. 20; Onslow v. South, 1 Eq. Cases Ab. 595, pl. 6; Hanson v. Graham, 6 Ves. 241; Butcher v. Leach, 5 Beav. 391; 2 Williams’ Executors 1051 a 1060 ; 1 Roper on Legacies by White, pp. 566, & seq.)
There is, however, an exception from the general rule that a gift to take effect at the death of a particular person, is contingent during his life. If, during his life, a beneficial interest is given to him or to any other person, in the capital of the sum bequeathed, the legacy is construed as a vested remainder, and is not defeated by the antecedent death of the legatee. (2 Will. Exec. pp. 1066-7, and cases cited.) But it is manifest that' this exception is not applicable to the present case, since under the provisions of the will, neither the annuitants, nor any other person during their lifetime, had any beneficial interest, either in the capital sum bequeathed or in its income. The sum of the annuities payable to the three annuitants who survived the testator, was only three hundred dollars, which was far less than the whole income of the testator’s estate, and the surplus income the executors and trustees were directed not to pay over to any person, but to accumulate until the death of the last of the annuitants. Hence, had the bequest been an absolute gift to a natural person, to take effect at the death of the last of the annuitants, it is impossible to doubt upon the authorities that it would have lapsed by the antecedent death of the legatee, and we know no reason, nor was any attempted to be given, why the same rule must not be applied where the gift is to a corporate body, and is accompanied with a trust. The continued existence of the corporate body, until the period when the gift is to take effect, is just as certainly a condition precedent to the *175 vesting of the legacy as that of the individual. In this case the Auxiliary New York Bible and Common Prayer Book Society, at the death of the last annuitant, by the prior expiration of its charter, had ceased to exist, and the necessary consequences are, that the legacy has lapsed and that the title set up by the appellants, The New York Bible and Common Prayer Book Society, wholly fails.
Had it been possible for us to say that the legacy was vested, we should still have been compelled to hold that its payment should not be decreed to the appellants, as its assignees. The assignment under which they claim was void in its origin. The gift to the Auxiliary Society was not absolute, but was clothed with a trust from which it could not be separated, and which from its nature was incapable of being assigned. The assignment of a trust is a delegation of the office of trustee; it is the institution of a new trustee, and the power of delegation and substitution never exists unless it is expressly given by the instrument creating the trust. In all other cases, the trust implies a personal confidence, which may be renounced but cannot be transferred. (Attorney General v. Scott, 1 Ves. Sen. 413 ; Alexander v. Alexander, 2 Ves. Sen. 643; Adams v. Clifton, 1 Russ. 297; Lewin on Trusts, 262.)
It is however alleged, that although, either from the lapse of the bequest or the invalidity of the assignment, there may be no trustee before the court entitled to claim the payment of the legacy, it is our duty as a court of equity to enforce the execution of the trust with which it is clothed, and for that purpose to appoint a new trustee to whom its payment may be decreed; and certainly if we have this power and are bound to exercise it, we could have no hesitation in selecting the appellants as trustees, and in making the required decree in their favor. If the trust existed, it is to them that its execution ought to be entrusted.
The present existence of the trust is therefore the question next to be considered, whether from the nature of the use to which the income of the legacy is directed to be forever applied, namely, the purchase and distribution of Books of Common *176 Prayer, there is a valid and subsisting trust, the execution of which has devolved upon the court, is in our judgment the only question in the cause that can create and justify a serious' doubt. It is certainly a question, which, from the extensive application of the principles which it involves, is of far more than ordinary importance, and we admit that its determination has been rendered somewhat embarrassing and difficult by prior decisions. The inquiry upon which it compels us to enter is, whether pious or charitable uses, wholly inconsistent with the rules of law in relation to all other trusts, were in force in this state prior to the adoption of the revised statutes. The will of the testator took effect some years before the revised statutes were adopted, and consequently it is not by their provisions, but by the law of the state as it then existed, that our determination must be governed.
Before we proceed to this inquiry, however, it will be proper to consider a preliminary objection which has been raised -on the part of the respondents, and upon which the vice-chancellor seems tó have rested his decision iü their favor; If this objection is -well founded, it supersedes the necessity of any further discussion. The gift to the Auxiliary New York-Bible and Common Prayer Book Society, is in its nature an executory bequest, and the objection is, that as such, it- exceeds the limits allowed by law, and as too remote, is -void in its creation. It is true,-that the principal sum of $1500 is to be paid to the society at the death of the last annuitant, but the society is directed to accumulate this sum for the period - of twenty-one- years, or until it shall amount to $5000, and it is therefore certain that during the term of accumulation, the full vesting of the gift is suspended. The gift is a limitation to take effect at the end of the term. The vice-chancellor thought this objéction to be fatal, and upon the single ground, that an absolute term, or term in gross, having no reference to an actual minority, cannot be added to lives in being, so as to enlarge the period of suspense, held the legacy to be void. In the opinion,' however, that such an addition to lives'in being is prohibited-by'law, the learned vice-chancellor certainly erred. He was misled by his reliañce on *177 the case of Beard v. Westcott, (5 B. and Ald. 801,) and was greatly-mistaken in 'supposing that the case, as understood by him, is consistent with all the prior decisions, and has not been overruled by any that are subsequent.
It is exceedingly doubtful whether the court of King’s Bench, by its certificate in Beard v. Westcott, meant to affirm the doctrine which the vice-chancellor adopts, but which the court of common pleas, by its previous certificate on the same case, had distinctly rejected. (Beard v. Westcott, 5 Taunt. 413. Yide opinion Bayley, B., 7 Bligh’s New. R. p. 238.) But admitting that the judges of the King’s Bench meant to decide the question as the vice-chancellor interprets their certificate, their decision has been expressly overruled by.the very deliberate judgment in the House of Lords, in the subsequent case of Cadell v. Palmer, (7 Bligh. 203.) By this judgment, which was founded upon the unanimous opinion of the attendant judges, and which affirmed the concurrent decrees of the vice-chancellor and chancellor, Bengough v. Edridge, 1 Sim. 173, it was definitely settled, that where an absolute term having no reference to a minority, and not exceeding twenty-one years, is added to lives in being, a limitation, to take effect only at the end of the term, is not too remote, but if otherwise valid, will.be sustained; and the same rule is plainly deducible from several prior decisions, (Lloyd v. Carew, 1 Shower’s P. C. 137; Goodmany. Goodright, 2 Burr. 873 ; Goodtitle v. Woods, Willes, 211,) and long before, had been laid down in the broadest terms by text-writers of the highest authority, by Blackstone, (2 Black. Com. 174,) by Wooddeson, (2 Wood. 229,) and above all, by the profound Pearne and his deeply learned commentator, Bugler. (Pearne on Ex. Dev. 7th ed. pp. 117, 399, 470; Contg’t. Rem. 429, 438.) It may not be improper'to add, that this rule was plainly understood by the revisers to be the settled law, several years before the decision of the House of Lords, in Cadell v. Palmer, since in their notes to the chapter Of Real Property, they state as one of the alterations in the law which they proposed and the legislature adopted, the “ period of twenty-one years after a life or lives in being, is no longer allowed as *178 an absolute term, but tbe rule is restored to its original object by being confined to the case of actual infancy.” (Rev. notes, 3 R. S. 2d ed. p. 572.)
As we cannot agree with the vice-chancellor that the bequest to the society is rendered void by the postponement of its vesting, we must proceed to the inquiry whether we are bound to execute the trust that accompanies the gift, by the appointment and through the medium of a new trustee. It is familiar law that equity will never suffer a trust to be defeated, by the mere circumstance that there is no trustee in whom the legal title is then vested, but the rule in general, can only be applied where the trust is valid, and there is a cestui que trust before the court, who claims its execution. As a general rule, chancery has no power to compel the performance or decree the execution of' a trust where there is neither a trustee nor a cestui que trust. The trust is then wholly void in equity as well as at law, and this is emphatically true when the trust involves a perpetuity; when, as in the present case, it locks up forever the capital of the property or fund which it embraces, and calls for a perpetual succession of trustees to administer the income.
Let it be admitted that pious and charitable uses are an exception from these general rules, it by no means follows that we are bound or have the power to execute the present trust. We have recently held, in the case of Ayres v. The Methodist Episcopal Church, (a) that where a charitable use is general and indefinite, no persons being certainly designated as objects of the intended bounty, the administration of the trust, if there is no trustee,' belongs in England, not to the court of chancery but to the crown, so that the chancellor in decreeing the execution of the trust, is acting not in the exercise of the rightful and proper jurisdiction of his court, but. as the delegated minister of a royal prerogative. No reasons have been given, nor authorities cited to induce us to change or modify the opinion which we then expressed, that discretionary powers similar to those which are exercised by the Lord Chancellor, as the delegate *179 of the crown, have never been exercised or claimed by the courts.of equity in this state, and cannot be assumed without an entire disregard of the principles upon which pur government is founded. The English cy pres doctrine, in its application to charitable uses, and in both the branches into which it is divided by the learned counsel for the appellants, is the fruit and result, not of a judicial but of an arbitrary discretion, contemning and disregarding the rules by which the court of chancery, in the exercise of it? own proper jurisdiction over trusts, has invariably been governed. We rejected the doctrine in the case to which we have referred, and we must reject it now, since it cannot be denied that the use which is attached to the present bequest, is just as vague and indeterminate as to the persons to be benefited; as those which in that case we refused to execute
Such would be our decision even if vie assented to the doctrine that charitable uses, contravening, the general rules of law in relation to trusts and perpetuities, were in this state recognized and sustained by law, prior to the adoption of the revised statutes. But as we cannot assent to this doctrine, it is not necessary, nor do we deem it expedient, to place our decision upon the narrow ground that has been stated. We hold that the use which in this case is attached to the legacy, became illegal as soon as the legacy itself had lapsed; it became illegal when there ceased to be a corporate body entitled to take under the will, and enabled by its. charter to accept the trust. We place our decision upon the broad ground that when the will took effect, the court of chancery in this state could not rightfully compel the performance, or in any mode decree the execution of a charitable use, creating or involving a perpetuity, unless where the property was given to a corporation, which by the terms of its charter was enabled to accept and execute the trust. The same question was before us, and very fully argued in the case of Ayres v. The Methodist Episcopal Church, and we now adopt, as a court, the views which were then explained as those of the individual who delivered our judgment, namely, that the only law giving a sanction to charitable uses, violating the gen *180 eral rules of law in relation to trusts and perpetuities, which was in force in this state at any one time prior to the adoption of the revised statutes, was derived exclusively from the provisions of the English statute of charitable uses, the famous statute of Elizabeth. And, consequently, when that statute, together with all other English statutes was repealed, it was intentionally and wholly abrogated.
The reasons that have led us to this conclusion are fully stated in the opinion to which we have referred, and it is needless now to repeat them. It is sufficient to say that it appears to us quite incredible that an enlightened legislature, when it repealed the statute of Elizabeth and the statutes of mortmain, meant to disregard and overrule the soundest measures of public policy, and established a system which the wisdom and experience of ages have condemned and rejected. It is therefore incredible that it meant to give to every individual the power of rendering his whole estate, real and personal, forever inalienable, by devoting its income forever to any use or purpose that he might deem, or others persuade him to believe, was pious or charitable. In other words, it is incredible that the legislature meant to enable every individual, under the form of a trust, “ To found a corporation unlimited in its duration and incapable of dissolution, having no power to dispose of .its property, yet unrestricted as to the amount it may hold.”
In the present case, we go still further and shall refer our denial of the power of our chancellor to sustain and execute a trust similar to that which the legacy creates, to a much earlier period than the repeal of the statute of Elizabeth. The use attached to this legacy is not a charitable use, in the usual and legal sense of the term. It is strictly a pious use. not otherwise charitable than as the noblest office of charity is the dissemination of religious truth, but it is impossible for a court of justice to sustain a use upon this ground, unless in a country where the truths of religion have been settled and defined by law, or judges have a discretionary power to determine and declare them. If, at any period in the juridical history of this state, it has been within the power of our court of chancery to decree the execu *181 tion of a pious use violating the general rules of law, this branch of its jurisdiction was in our judgment wholly abolished long before the statute of Elizabeth was repealed. It was wholly abolished when the constitution of 1777 was adopted. Under a constitution which extends the same protection to every religion and to every form and sect of religion, which establishes none and gives no preference to any, there is no possible standard by which the validity of a use as pious can be determined; there are no possible means' by which judges can be enabled to discriminate, between such uses as tend to promote the best interests of society by spreading the knowledge and inculcating the practice of true religion, and those which can have no other effect than to foster the growth of pernicious errors, to give a dangerous permanence to the reveries of a wild fanaticism, or encourage and perpetuate the observances of a corrupt and degrading superstition. Hence, unless all uses that may be denom: inated pious shall be subjected to the same rule as other trusts, we shall find no escape from this alternative: either all uses for a religious purpose, whether the religion which they are intended to aid be true or false, rational or absurd, must be upheld and enforced; or the uses connected with a particular form of religion must be selected as the special and exclusive objects of favor and encouragement. If we adopt the first course, we renounce the principle upon which pious uses were first introduced, and upon which alone their defence can be rested, namely, their tendency to benefit society by diffusing the knowledge and practice of true religion. We disregard and practically deny the eternal distinctions between truth and falsehood, and give the sanction of law to the pernicious absurdity, that all religions, however contradictory in their tenets and in their precepts, have a just and equal claim, not merely to the protection, but to the favor of government; and are not simply to be tolerated but encouraged. If we adopt the second alternative, we violate that equality between different religions and' different forms and sects of religion, which the principles of our government and the provisions of our constitution are designed to secure; we create an odious distinction in the power to dispose of their own *182 property between different classes of onr citizens; and by declaring that the religion which we favor is alone true, we establish it, in a restricted, it is true, but in a definite sense, as the religion of the state.
We are quite aware of the answer that has sometimes been given to this objection. Christianity, it has been asserted, is now, in a modified sense, the religion of the state. It is so, as a part of that common law which our ancestors introduced and we have retained. Christianity therefore furnishes the test that is desired, so that in judging of the validity of a use as pious, we have only to inquire whether it is in harmony with the doctrines that Christianity teaches. The maxim that Christianity is part and parcel of the common law has been frequently repeated by judges and text writers, but few have chosen to examine its truth or attempt to explain its meaning. We have, however, the high authority of Lord Mansfield and of his successor, the present chief justice of the Queen’s Bench, Lord Campbell, (Campbell’s Lives of Chief Justices, Vol. 2, p. 518,) for stating as its true and only sense, that the law will not permit the essential truths of revealed religion to be ridiculed and reviled. In other words, that blasphemy is an indictable offence at common law. The truth of the maxim in this very partial and limited sense may be admitted. But if we attempt to extend its application, we shall find ourselves obliged to confess that it is unmeaning or untrue. If Christianity is a municipal law, in the proper sense of the term, as it must be if a part of the common law, every person is liable to be punished by the civil power who refuses to embrace its doctrines and follow its precepts ; and if it must-be conceded that in thiá sense the maxim is untrue, it ceases to be intelligible, since a law without a sanction is an absurdity in logic and a. nullity in fact.
Let it be admitted, however, that Christianity is a part of the common law, in any sense of the maxim which those who assert its truth may choose to attribute to it. The only effect of the admission is to create new difficulties, quite as impossible to overcome as those. that have already been stated. How, we would then ask, in judging of the validity of a use as pious, are *183 we to apply the test which Christianity is said to furnish ? It will not be pretended that the common law has supplied us with any definition of Christianity, yet without a judicial knowledge of what Christianity is, how is it possible to determine whether a particular use, alleged to be pious, is or is not consistent with the truth which Christianity reveals? No religious use has been or can be created, that does not imply the existence and truth of some particular religious doctrine, and hence when we affirm the validity of a use as pious, we necessarily affirm the truth of the doctrine upon which it is founded. In a country where a definite form of Christianity is the religion established by, law, the difficulty to which we refer is not felt, since the doctrines of the established Church then supply the criterion which is sought-; but with us it can readily be shown that the difficulty is not merely real and serious, but insurmountable.
Let us suppose that a Roman Catholic had devised his whole estate, real and personal, to trustees and their heirs in trust, to apply the income forever, one half to the purchase of indulgences for the benefit of such as might seek them, and the other moiety to the payment of,daily masses for the safety of his soul, and that the validity of this devise were the question now to be determined. In England, such uses are held to be void as superstitious, but the statute by which they are declared so we have repealed, and some other rule or principle must be found to govern our decision. The uses, it is manifest, imply the existence and trnth of certain important doctrines. They imply that our Saviour has delegated to the Pope; as his vicar upon earth, the absolute and unconditional power of pardoning sin. They imply the existence of a purgatory, and the duty and efficacy of prayers for the dead. Such is the necessary import of the uses, upon the validity of which, guided by the light of Christianity, we are required to pronounce. Shall we, by sustaining them as pious, declare that the doctrines which they imply belong to the class of truths which the New Testament reveals; or shall we, by rejecting them as superstitious, condemn as false and corrupt the ancient faith which so large a class of our citizens avow and follow? Are these questions over which we, as judges, *184 whatever we may privately think, have Any jurisdiction ? Are they-questions which any .court of justice in this state, at any time since the formation of our present government, could rightfully entertain and decide? Such are the questions that must be considered and decided, if uses inconsistent with the general rule of law are to be sustained as pious, and .the proper test of their legality, as such, is. their correspondence with the true doctrines of Christianity.
For ourselves, if the case that we have supposed were now before us, we should not hesitate in pronouncing our judgment, abstaining from any remarks upon the nature and'tendency of the uses, neither admitting them to be pious nor condemning them as superstitious; we should hold the devise to be entirely void, as repugnant -to those wise and salutary rules of law which forbid the citizen to withdraw his property, beyond a limited period, from that free circulation which the interests of commerce and the healthful action and permanence of our.republican institutions alike demand: and if this would be a proper decision in the case supposed, it is manifest that the same judgment ought to be pronounced in every case where a trust, which involves a perpetuity, is sought to be maintained upon the sole ground of its piety. We may be disposed to regret that a perpetual trust .for the distribution of that sublime manual of true devotion, perhaps the noblest of human compositions, the Book of Common Prayer, cannot be sustained; but the regret.must cease when we reflect that it can only be; sustained upon a prin-. ciple that-would render just as valid a-similar trust for the circulation of the monstrous fables of the Talmud or the-gross impostures of the Koran.
Had the New York Auxiliary Bible and Common Prayer Book Society, been a living corporation at the death of the last annuitant, we strongly -incline to think that -the case would be free from difficulty, since the use to which the income of the legacy is directed to be applied is one of the purposes for which the society was incorporated. We incline to think that the use creates a trust which the society by the fair interpretation of its charter was-empowered .to accept, but as the legacy never vested *185 and could not be assigned, tbe appellants, the New York Bible and Common Prayer Book Society, have no title or interest upon which a claim for relief can be founded. It has not a locus standi injudicio ; nor, for the reasons that have been stated, can we secure the performance of the trust by appointing a new trustee, to whom the payment of the legacy may be decreed. As a lapsed legacy, it has sunk into the residuum.
We pass to the second legacy, the bequest to the General Theological Seminary, and a few observations will here suffice to explain the grounds of our decision. It is not denied that the seminary fully answers the description in the codicil, of a seminary established under the authority of the General Convention of the Protestant Episcopal Ohurch, for the instruction in theological learning of young men intended for the ministry in that church; and hence, had the gift been absolute, we see no reason to doubt that it would have been our duty to decree its payment. But the legacy in this, as in the preceding case, is clothed with a trust, and the objections are, 1st. That the, seminary is not empowered by its charter to accept and execute a trust of any description. 2d. That in this case the trusts, or a portion of them, are entirely foreign to the purposes for which the seminary was established or incorporated. And lastly, that as the seminary is incompetent to take, this court has no power to compel the performance of the trusts, as there is no cestui qjue trust, and they involve a perpetuity. This last objection, if either of the two first are valid, it will be unnecessary to consider; it is covered by the decision we have already made, that unless there is a trustee authorized by law to perform the trusts, a pious use, if inconsistent with the general rules of law, is wholly void. It is only upon the ground that the uses which are attached to this legacy are pious, that they are asse'rtei to be valid, and it is not denied that they involve a perpetuity. The first question is, then, whether the seminary is competent to take or hold any property, real or personal, as a trustee.
Let it be admitted that a corporation, merely by virtue of its incorporation, without any express authority given by its charter, has the same capacity to take property upon trust as a *186 natural person. It is manifest that it can only be authorized so to take, when the trust itself is lawful. 'When the trust, as creating a perp'etuity, or for other reasons, is contrary to the general rules of laifr, it is immaterial whether the legal title be given to a corporation or to any individual. In either case the limitation is Avholly void, unless the corporation by the true interpretation of its charter is authorized to accept and exeeute the trust; and we think that this authority, when not given in terms, may be justly implied whenever the object of the'trust, the end which it seeks to accomplish, is the purpose, or one of the purposes, for which the corporation was created.
It is certain that the uses which in' this case are attached to the legacy, had it' been given to an individual, would have rendered it illegal and void, and the only inquiry that remains is, whether they are legalized by the charter of the seminary. In other words, is the object of the trust which these uses create, one of the purposes for which the seminary was incorporated ? It is somewhat remarkable that the act of 1822, (Sess. Laws, 1822, p. 140,) by which the Theological Seminary was incorporated, contains no specification whatever of the objects or purposes of the incorporation'. It gives to the seminary the power of taking and holding, by devise or purchase, real or personal estate, of which the annual income shall not exceed a certain limited amount, but without specifying the uses to which either capital or income shall be applied. It declares that the corporation shall have power to dispose of all its real and personal estate, at its own will and pleasure. As this absolute power of disposition is co-extensive with the property which the seminary is authorized to hold, it seems necessary to exclude the presumption that it was intended by the legislature, that any portion of that property might be rendered inalienable by the operation of a trust. At any rate, the terms of the charter are not such as to enable us to say that the uses of the trust in the present case correspond with any object or purpose for which the institution was incorporated. It is true that the very name or title of the institution suggests, and must have suggested to the legislature its general object, viz., the education of youth *187 for the ministry of the Episcopal Church, and this general object, the legislature, by granting the charter, may be said to have sanctioned; but as the foundation of a perpetual scholarship is plainly not a necessary means of accomplishing the object, we have no right to say that it was meant to be sanctioned by the legislature, especially as the very words of the charter, in their natural construction, exclude the supposition. We regret to find that the charter of this noble institution is so. exceedingly defective. 'Looking to the objects which the institution seeks to accomplish, and to the most expedient means of their accomplishment, we cannot doubt that its charter ought to contain express provisions relative to the foundation of professorships and scholarships, and ah express authority to receive donations in trust for these purposes; but we have no power to amend the charter. We must construe its provisions as they are, and would violate our duty should we attempt, by a strained and violent construction, to make' them correspond with our personal wishes.
Were it possible to overcome or evade the objections, that the seminary has no power to hold property in trust at all, and certainly not when the trust as a perpetuity is illegal, another objection remains, which, even had the charter expressly authorized the foundation of perpetual scholarships,'would have compelled us to say, that the trust annexed to the legacy renders the gift inoperative and void. The trust is not limited to the application of the income of the capital, which it locks up forever, to the maintenance of a scholar to be selected and nominated in the manner that the will provides, but the testator, foreseeing that a vacancy in the scholarship might occur that could not be immediately supplied, provided for the contingency by declaring that during the continuance of every such vacancy, the annual interest of the capital sum bequeathed shall be given to a person, to be appointed by the bishop of the diocese of New York, who shall deliver a lecture in Trinity church, in the city of New York, upon the evidence and truths of the Christian religion on the day of the opening of the convention of the Episcopal Church. It cannot be pretended that *188 this use, the application of the interest to the payment of an annual religious lecture in Trinity church, not to the students-of the seminary, but to the convention of the church, had any relation to .the objects for which the seminary was incorporated. It is a foreign and extrinsic use, creating a trust which, upon no construction of its charter, was the seminary authorized to accept and execute. It is therefore a general pious use, without a trustee or a cestui que trust, and involving a perpetuity. As such, it is absolutely void, and the necessary effect of its invalidity is to avoid the entire limitation, of which it is a constituent and essential part. It is no answer to say that the contingency of a vacancy in the scholarship may not occur. It is Settled law, that to render a limitation void, which, if sustained, would create a perpetuity, it is sufficient that the event upon which it depends may happen, and here the event is not merely probable, but almost certain to happen.
Nor can we get over the difficulty and sustain the trust, by holding that this particular use alone is void. The trust as created by the testator is entire and indivisible, and cannot be separated without defeating its main intent. Should we direct 'that during a vacancy in the scholarship, the interest of the legacy shall be paid to the representatives of the testator, as the vacancy might never be filled, and during its continuance the capital is locked up, the objection of a perpetuity retains all its force. And should we direct the capital to be paid over, the perpetual scholarship is gone and the principal intent of the testator defeated. The retaining of this capital by the seminary is of the essence of the trust, a necessary condition of its fulfilment, and as this condition is illegal, the entire limitation must be void.
There are other weighty objections to the validity of the trust which we forbear to notice, since those that have been stated, we cannot but think, are demonstratively fatal.
The decree of the vice-chanceller must therefore be affirmed as to both legacies, but without costs upon this appeal. In the actual state of the decisions, the appeal was eminently proper, and we trust that the proceedings will not stop here. It is desirable that the vexed and highly interesting questions which *189 tbe case involves shall be finally settled, and we earnestly hope that they will be settled by an appeal from our decision to the court of ultimate resort.

 Now reported, ante vol. iii p. 351.